CHARLOTTE, Plaintiff in Error, *vs.* CHOUTEAU, Defendant in Error.

1. Instruments of conveyance executed in the presence of a Spanish lieutenant governor, and deposited among the archives of the Spanish government, are *records* of the Spanish government within § 13 of the " act concerning evidence," (R. C. 1845, p. 469,) and copies of such " archives," duly certified by the recorder in whose office they by law are deposited, are admissible in evidence.

2. The enslavement of the African race was recognized as legal in the Spanish, French and British colonies in America, although no law can be found which, in terms, reduced that race to bondage.

3. Where negroes reduced to slavery acquired their freedom under the laws of the country in which they lived, they could not be again subjected to bondage: There is no prescription against liberty in such a case.

4. A descendant of a negress brought to St. Louis in 1794 or 1795 from the province of Canada, and sold as a slave, is entitled to her freedom, provided it be shown that the mother was never lawfully held as a slave in Canada, or that having been lawfully held as a slave, the law afterwards gave her a right to her freedom, and that she asserted the same. If, having been once a slave in Canada, she failed to assert her right to freedom there, and came to St. Louis with her master, neither she nor her descendants will be permitted to assert it here.

5. A conveyance of a negro in the presence of the Spanish lieutenant governor of Louisiana, and authenticated by his signature, cannot be regarded as an adjudication that such person was a slave.

*Error to St. Louis Circuit Court.*

This was a suit by the plaintiff suing as a poor person to establish her right to freedom. It is averred in the petition for leave to sue, that the petitioner " is entitled to freedom by being born of a negress named Rose, who herself was born at Montreal, in Canada ; that about the year 1791, the said Rose was removed from Canada by a certain John Stock, an Indian trader, to his trading post at Prairie du Chien, in the northwestern territory of the United States, west of the River Ohio, where she was detained by him as his slave until his death, some time in the year 1793 ; that she is informed that after the death of said Stock, she (Rose) was brought down to St. Louis by a certain Andrew Todd, a trader, who sold her as a slave to a Mr. Didier (a priest), contrary to a provision of an ordinance of the congress of the United States, entitled "An ordinance for the government of the territory north-west of the River Ohio," passed July 13th, 1787 ; that she remained in the possession of said Didier, as his slave, and was afterwards sold by him, as such slave, to one Auguste Chouteau, since deceased," &c. The declaration and plea were in the form usual in suits for freedom. On the trial, it was proven that plaintiff, Charlotte, was the daughter of a negress named Rose ; that the said Rose was at Mackinaw and Prairie du Chien between the years 1791 and 1794, and was there acting in the capacity of a servant to sundry persons ; that shortly afterwards, the said Rose was taken to St. Louis, where she was sold as a slave to Mr. Didier, a priest, who afterwards sold her to Mr. Auguste Chouteau, under whom the defendants claim, by whom also she was held as a slave. Much testimony was given tending to show that slavery did not exist in Canada, (where it is claimed that Rose, the mother of plaintiff, was born) and was not lawful there after the year 1763.

The plaintiff offered to read in evidence certain copies of papers found among the Spanish archives, being known as archives Nos. 666 and 750 ; one purporting to be a copy of a bill

of sale or conveyance, executed by Andrew Todd, merchant of Montreal, to Mr. Didier, curate of the parish of St. Louis, of a negress named Rose, a slave, aged about twenty-seven, and acquired by said Todd of the estate of John Stock. This conveyance was executed October 28th, 1795, before, and authenticated by Manuel Goring Moro, commandant of St. Louis. The second paper offered in evidence as above stated, purported to be a copy of a conveyance of the same negress, Rose, and two infant children, made August 8th, 1798, by said Didier to Auguste Chouteau, executed before, and authenticated by, Zenon Trudeau, lieutenant governor, &c., of Louisiana. This instrument of transfer purported to convey " a negress named Rose, a native of Montreal, government of Canada, aged about thirty years," &c. To the first of these copies there was appended the following certificate : " State of Missouri, county of St. Louis, ss. I, John Ruland, clerk of the Circuit Court and *ex-officio* recorder for the county aforesaid, certify the foregoing to be a full, true and correct copy of archive No. 666, as the same remains on file in my office. In witness whereof, I have hereto set my hand and affixed the seal of said court, at office, in the city of St. Louis, this 24th day of September, A. D. 1840. John Ruland." (Seal.)

The second copy was certified in the same manner. The defendant objected to the giving of these copies in evidence, on the ground of irrelevancy and incompetency, and because they were at best only copies, and the originals ought to be produced or accounted for. The objections of defendant, except as to irrelevancy, were sustained, and the copies were rejected. The plaintiff excepted. It appears from the record that " the plaintiff then offered to read from a record book from the recorder's office, the following : (it does not appear what was read, or whether or not it was the record of the archives Nos. 666 and 750, copies of which, made in 1840, were offered in evidence, as above stated, and rejected. Reporter :) the originals not being in the office of the recorder or in the keeping of the plaintiff, which was objected to by the defendant, for the same reasons

stated above respecting the copies above mentioned, which objection was sustained by the court, and plaintiff's counsel excepted." The court, upon the motion of defendant, gave the following instruction : " There is no evidence before the jury sufficient to establish that the plaintiff is entitled to her freedom." Whereupon, the plaintiff took a nonsuit, with leave to move to set aside the same. The court refused to set aside the same, and the plaintiff brought the case to this court by writ of error. This case was previously on error, and the decision of this court is reported 11 Mo. Rep. 193. The trial was had at the April term of the Circuit Court, for the year 1853.

*Uriel Wright* and *Cobb*, for plaintiff in error. 1. The instruction given by the court was erroneous. The court usurped the function of the jury, and determined the sufficiency of the evidence. There was some evidence to support the issue for the plaintiff. 2. The court erred in excluding the two copies of deeds taken from the archives. The objection did not deny the originals. By the act of 1815, it was made the duty of the recorder to record all the papers found in the archives of the previous governments. ( See *Parke* v. *Roussin*, 8 Mo. 346. ) A copy from the record of the archives would be evidence, and, on general principles, the copy of the archives would be also. The officer who certified the copy is the same officer who was to record the paper. If a copy of a copy be evidence, a *fortiori*, a copy of the paper itself must be. The evidence was relevant to prove by estoppel the birth-place of Rose, the mother of plaintiff.

*Geyer & Dayton*, for defendant in error. 1. The instruction given was properly given. The plaintiff was not entitled to freedom by reason of the fact that her mother was held as a servant or slave in Prairie du Chien, or Mackinaw. ( *Chouteau* v. *Pierre*, 9 Mo. 3 ; *Scott* v. *Emerson*, 15 Mo. 577. ) 2. There was no evidence before the jury showing or tending to show that Rose, the mother of plaintiff, was born in or ever was in Canada. 3. The copies of conveyances offered, and in which alone there is any evidence of the birth-place of Rose,

were properly rejected. The originals were not accounted for, and no attempt was made to account for them or to produce them. They, of course, were not evidence, unless expressly authorized by our statute. They are not within either of the provisions of the statute concerning evidence. (R. C. 1845, p. 468–9.) They were properly rejected because the testimony was immaterial, and, had it been admitted, could not have affected the result. If the court erred in rejecting these papers, still the judgment should not be reversed unless it appear that, had they been admitted, the judgment would, or at least might have been different. Such is the rule where a plaintiff takes a nonsuit, and brings the case here by writ of error. Had these conveyances been admitted, the case would have stood thus: Rose, the mother of plaintiff, was a negress, born in Canada, about 1765; brought to St. Louis in or as early as 1795, during the time of the Spanish government; held as a slave here; twice sold as a slave by instruments of conveyance, executed before, and authenticated by, the Spanish lieutenant governor and commander here, and by other witnesses; and continued to be held as a slave by an inhabitant of the territory during the residue of the existence of the Spanish government here, and during the period of the French rule here, and was thus held as a slave by an inhabitant of the country at the time it was acquired by the United States, and afterwards was held as a slave here for many years, and to the time of her death; never, so far as appears, claiming any right to freedom, nor did any of her children—all of whom were born here—assert any right to freedom until within a few years past. On this state of the case, we make the following proposition: That the plaintiff is not entitled to freedom by reason of the fact that Rose, her mother, was born in Canada, though it be admitted that slavery never did exist there as a fact. We have no right to inquire whence the inhabitants of this country, under the Spanish government, acquired their negro slaves. It makes no difference, in point of law, whether they captured them in Canada or Africa. The court must take

Charlotte v. Chouteau.

notice that it was lawful under the Spanish and French gov-
ernments to hold negroes in slavery here. It was not estab-
lished here, nor, perhaps, anywhere else, by positive law. It
existed here as a fact, and the laws recognized slaves as prop-
erty. No law is believed to have existed prohibiting the ac-
quisition of negroes from any quarter. That the slave or his
ancestors were originally born free, in some country, is proba-
bly true in every instance. This is true in reference to all the
slaves in the United States. Negroes are now held in slavery in
the states of this Union whose ancestors were originally brought,
without any authority of law, from Africa, where they were born
free, and had always been free. No positive law either au-
thorized their capture or declared them to be slaves. Yet their
descendants are not, for that reason, entitled to their freedom.
Negroes were held in slavery and recognized as property here
under the Spanish government. Whether they had been ob-
tained *direct* from Canada or Africa, they had once been free ;
but, in either case, became here slaves and property. Why,
in this case, go back to inquire whether slavery existed as a
fact in Canada ? Slavery existed here as a fact, and Rose was
held as a slave here at least eight years before we acquired the
country. If we are to go one step back of this, where shall
we stop in the inquiry ? Supposing it to be ascertained that
when Rose was born and lived in Canada, slavery *did* exist
there as a fact, can we then go farther and ascertain if *her*
mother was not born in England, or Africa, where slavery did
not exist ? Why, if we start at all in this inquiry, shall we not
proceed until we come to some ancestor who was born free ?
And why should not the consequence be the same, however re-
mote that ancestor may be found ? A more dangerous princi-
ple could not well be established.

SCOTT, Judge, delivered the opinion of the court.

The copies of the archives, offered in evidence, should not
have been excluded. The last clause of the 13th section of the
act concerning evidence prescribes that " a copy of any record

of the French or Spanish governments deposited in the office of the recorder of any county, being duly certified by him, shall be received in evidence, with like effect as the original." This provision is declaratory of a principle of the common law. In the case of the *United States* v. *Percheman*, (7 Pet. 53,) it is said, " on general principles of law, a copy of a paper given by a public officer, whose duty it is to keep the originals, ought to be received in evidence." The papers excluded were such as are contemplated by the section referred to. They were copies of the records of the Spanish government, deposited in the office of the recorder of St. Louis county, as appears by his certificate. The originals were authentic instruments, executed in the presence of the lieutenant governor, and deposited among the archives of the government.

Had these papers been admitted in evidence, they would have showed that Rose, the ancestor of the plaintiff, was born in Canada, and consequently the question would have arisen whether slavery, in fact, did ever exist in that province, so that an African and his descendants could have been lawfully held in bondage. For if Rose, the mother of the plaintiff, was ever lawfully a slave, though the law afterwards gave her a right to freedom, yet, if she failed to assert it there, and came with her master here, neither she nor her descendants will be permitted to assert it now.

We cannot yield to the argument that the plaintiff has no right to go back and show that her mother was free, in order to establish her right to freedom, on the ground that we cannot inquire whence the inhabitants of this country, under the Spanish government, acquired their negro slaves, it making no difference, in point of law, whether they captured them in Canada or Africa.

As the successors of the Spanish government, the authorities now existing here must take notice of the laws which prevailed in this country when it was a dependency of the kingdom of Spain. Our courts take judicial notice of those laws. Although we have seen no law or laws which, in terms, reduced

Charlotte *v.* Chouteau.

the African race to bondage, yet it is an historial fact, as well authenticated as any other, that the slavery of that race was recognized as legal in the Spanish, French and British colonies in America. Negroes were captured in Africa, brought to America and held in servitude. But when any of this race, who were then reduced to slavery, acquired their freedom under the laws of the country in which they lived, we are aware of no law by which they, except for crime, could be again subjected to bondage. The principle that there is no prescription against liberty, applied to them as well as to those of any other color. No law has been shown to us by which the Spanish authorities of Louisiana were authorized to reduce free persons to slavery. The fact that a conveyance of a negro was made in the presence of the lieutenant governor, and authenticated by his signature, in a colony where slavery was tolerated, and in whose presence it was customary to execute such instruments, and it not appearing that he had knowledge that the negro was not a slave, on no principle can be regarded as an adjudication that such person was a slave. Such instruments, so passed and authenticated, were only intended as evidence of the transfer of the title of one person to another, and never were supposed to be an adjudication as to the status of the person transferred by the instrument. Such an act would be evidence that the government tolerated slavery, but we cannot see how it would have the effect of determining whether the negro named in the conveyance was a slave or not. The courts of this state will protect the inhabitants in the enjoyment of all the rights they possessed under the Spanish government; but they are bound to resort to those laws, in order to ascertain whether a right existed under them or not. In the courts of Louisiana, in a case in which the Spanish law, as it existed here before the change of government, was administered, it was held, referring to the Spanish law of the third Partida as authority, that, if a man be free, no matter how long he may be held by another as a slave, his estate or condition cannot be thereby changed, nor can he be reduced to slavery, in any man-

ner whatever, on account of the time he may have been held in servitude. (*Delphine* v. *Devize*, 2 Martin N. S. 650.) This principle was asserted in a case in which the descendant of a negro woman was suing to establish her right to freedom.

The cause will be remanded, in order that the fact may be tried whether Rose was lawfully a slave in Canada.

The other judges concurring, the judgment will be reversed, and the cause remanded.